SAMUEL G. CURRIE *et al. vs.* MAX NATHANSON.

FEBRUARY 13, 1937.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker, and Condon, JJ.

Moss, J. This is an action of deceit for alleged false representations by the defendant to the plaintiffs, in reliance upon which they purchased from him on August 14, 1933, for $7,000, the entire capital stock of the Alton Amusement Company, a corporation. They alleged that the stock proved to be utterly worthless and that they lost not only the $7,000 paid by them to him, but also $3,000 in addition, which they claimed to have spent in behalf of the corporation in reliance on the false representations by him, and which was wholly lost to them.

A trial in the Superior Court resulted in a verdict by the jury for $10,000, which the trial justice, upon the defendant's motion for a new trial, based on the usual grounds, refused to set aside. The case is now before us on the defendant's bill of exceptions, based on his exception

to that decision, eighteen exceptions to rulings of the trial justice as to the admission of evidence, and exceptions to his refusal to direct a verdict for the defendant, to his refusal to direct a verdict for the plaintiff for ten cents damages, to his refusals to direct the jury to make special findings on two questions as requested by the defendant, to his refusal to charge the jury as requested by the defendant, and to certain portions of the charge as given.

The corporation on August 14, 1933, was in possession of a moving-picture theatre and its appurtenances and fixtures, in the City of Woonsocket, under a lease which would expire on January 31, 1942. It also owned valuable equipment, which was in the theatre and had been used in its operation. The theatre had been closed for some months, however, on account of poor business. In making the purchase of the stock the plaintiffs relied upon the assurance given them by the defendant that the corporation had then no debts or contract obligations, "except obligations for unplayed picture contracts." It was understood, however, that this did not apply to the rent of $500 which had become payable August 1, and which the plaintiffs were to pay.

In fact, besides these obligations and this August rent, the corporation was indebted on a note for $3,000, secured by a chattel mortgage on the equipment owned by it, and also in the total amount of just about $4,000 for back rent, taxes, etc., which it had been obligated to pay under the terms of the lease, but which it had not paid, and a few small bills. The defendant, when he gave this assurance to the plaintiffs, knew of its falsity.

The plaintiffs, in reliance on this assurance, after taking complete control of the corporation, loaned some money to it so that the theatre could be operated, as the corporation was without funds. The corporation began to operate the theatre on August 25, 1933, and the plaintiffs continued to loan the money necessary to pay the costs of operation above the receipts from sale of tickets, etc. They

also paid the August rent of $500, but made no other payments under the lease.

Not later than the first week of October the plaintiffs were informed of the indebtedness of the corporation and then had the right, as against the defendant, to rescind the purchase of the stock, tender the return of it to him and recover from him the purchase price, after taking back from the corporation any money in its treasury, which they had advanced to it, if any there was, and to hold it liable for the unpaid balance of money so advanced. Instead of doing so, they chose to retain the stock and have the corporation continue the operation of the theatre, which it did until December 4, 1933, or thereabouts. Then, having lost very heavily in operating the theatre during this period of continued operation, and being hard-pressed by the lessors for the payment of the back rent and other obligations under the lease, which the lessors had then the right to terminate, the corporation closed the theatre and surrendered the lease and possession of the premises to the lessors.

About a month later the corporation made a lease of the equipment to one of the lessors. Later the lessors recovered a judgment against the corporation for its unpaid obligations under the lease of the theatre and had the equipment sold, under execution, for less than enough to pay the judgment, the mortgage on it having meantime been discharged without any payment on it by the corporation or the plaintiffs. Then the corporation was without assets and still heavily indebted, and its stock was worthless.

During the time when it was in possession of the theatre the plaintiffs, as above stated, had loaned the corporation, according to their testimony, somewhat over $3,000. They alleged in their declaration "that following the purchase of said stock and further relying upon the truth of said representations the plaintiffs undertook to operate said Park Theatre and they had expended in connection therewith

considerable sums, to wit, more than two thousand ($2000) dollars when they first learned of the above existing or unpaid obligations." But their evidence did not show the dates or amounts of any loans made by them to the corporation, and it did not show that they had loaned anywhere near $2,000 before they learned of the indebtedness of the corporation.

Their own exhibit 10, entitled, "Statement for Park Theatre August 25-December 11, 1933," which they or the corporation under their control had compiled, shows payments as follows: "August 15, Blackstone Valley $100"; "August 15, New Eng. Tel. & Tel. $15.00"; "Cash Paid Register Aug. & Sept. (35), $4787.29", making a total of $4,902.29. The same exhibit shows the cash received from admissions and miscellaneous, for the same period, as $4,221.87, making apparently an operating cash loss of $680.42, defrayed by the plaintiffs. It was not shown by the evidence whether or not the above amount of $4,787.29 for cash paid out included the payment, above mentioned, of $500 for the August rent under the lease, or whether it included any payments for the use of the pictures or for the use of the projecting machines, or whether any payments were made for the use of the pictures or the machines. If it did not include such expenditures, it is hard to see how so much money could have been spent.

The same exhibit shows, for the operations in October, November and December, payments of $7,288.73 and receipts of $4,870.75, making a cash loss of $2,417.98, defrayed by the plaintiffs. Adding this to the above-mentioned loss of $680.40 for operating in August and September, gives a total cash loss of $3,098.40, defrayed by the plaintiffs. The exhibit shows also the payment of the purchase price of $7,000; and the total of payments, including this purchase price, is stated thus: "Total cash paid $19,191.02". At the end of the statement of the cash received is the entry: "Total cash received $9092.62." The final statement of the difference between these two

figures of totals is given thus: "Money invested by the Desrochers and Currie $10,098.40." This harmonizes very well with the testimony of one of the plaintiffs that all told they put into the corporation, "to carry on", about $3,000. There was no evidence that they put any of this into the treasury of the corporation before the money was needed.

The loss for October, as shown by exhibit 10, was $566.17, and if one-fourth of this is assigned to the first week of October, which seems generous to the plaintiffs, the loss for that week would be $141.53. If this is added to the loss of $680.40 for the prior period of operation, this would make the cash loss suffered by the corporation, before the plaintiffs learned its true financial condition, not more than $821.95. If they had advanced any more money than this before they got this information, they did not show it by their evidence; and the rest of the money put by them into the corporation and lost was lost because, after learning its true financial condition, they chose to "send good money after bad" by financing the operation of the theatre for some two months longer, with heavy and constantly increasing losses.

By the charge of the trial justice to the jury as to the damages which they could award to the plaintiffs for the loss of money furnished by them to the corporation, the jury were limited to money so furnished before the plaintiffs had notice of the corporation's indebtedness. Yet, if the jury, in arriving at their verdict of $10,000, awarded to the plaintiffs, as their direct loss resulting from the purchase of the stock, the full amount of the purchase price of $7,000, with interest to the date of the verdict—and they could not have properly awarded any more—they must have awarded to the plaintiffs just about $2,200 for money supplied to the corporation. In our judgment this was clearly far beyond what the evidence could justify, and therefore we find that the defendant's ground of objection to the verdict that the damages were excessive was well taken and should have been sustained by the trial justice on the defendant's motion for a new trial.

The trial justice in his charge told the jury that the rule of damages in the case was very simple and said: "I will state that rule to you in the language which our own Supreme Court has used in this connection. The measure of the defendant's liability in a case of this kind is the loss, if any, actually sustained by the plaintiffs by reason of their reliance on the alleged false representations of the defendant." The transcript shows that this language was taken from the opinion of this court in *Phillips* v. *Hebden,* 28 R. I. 1, and it was taken substantially verbatim. That was an action in deceit, brought by one who alleged that he was unable to collect for goods that he had sold to the defendant on credit in reliance on a fraudulent representation by the latter that he owned certain property, which really belonged to his wife. The language quoted in the instant case was immediately preceded in the cited case by this ruling: "The defendant takes nothing by his exception to the refusal to charge the jury that 'the measure of damages at the most must be what the plaintiff could have gotten out of that property if it had belonged to the defendant, instead of to his wife.'"

Yet the trial justice in the instant case, a little further along in his charge, stated to the jury a rule based on the same idea as this rejected charge in *Phillips* v. *Hebden, supra,* saying: "Now, in the first place with respect to the capital stock that the plaintiffs bought, the rule for you is this, that the plaintiffs are entitled to recover so much as that stock was less in value by reason of the outstanding debts and obligations. Take the value of that stock and deduct such value as it lost by reason of the outstanding debts and obligations, and that is the loss which the plaintiffs have suffered in connection with the direct investment of the $7000 in the capital stock of the Alton Amusement Co."

These two parts of the charge seem to us entirely inconsistent with each other. The former seems to be based on the general rule as to damages in actions for deceit, which

is stated in 2 Sedgwick on Damages, (9th ed.), § 439, and which has been held by the Supreme Court of the United States in *Smith* v. *Bolles*, 132 U. S. 125, and the other federal courts and by the highest courts of many of the States and by the English courts to be the correct rule to be applied in a tort action brought against the seller of property by a purchaser who has been induced to buy it by fraudulent representations by the seller as to facts affecting its value or title. By this rule the measure of recovery is the amount of loss actually suffered by the purchaser by reason of the purchase, the direct loss being the amount by which the value of the property received was below the value of the consideration paid for it. In some cases recovery has been allowed also for later loss sustained in consequence of the deceit, but under this rule no recovery can be had for the failure to make from the purchase a profit that would have been made if the false statements had been true.

The latter part of the charge is clearly based on the other rule, which prevails in a majority of the States that have passed upon the question of damages in such a case. That rule is that the measure of the direct damages is the amount by which the value of what the purchaser actually received was below the value of what he would have received, if the facts had been as stated to him by the seller. This is the same rule that would be applied, if the seller had contracted that his statements were true and the purchaser had brought an action for breach of contract, instead of in tort. It includes any profit which the purchaser would have made, if the statements had been true. Both rules are stated and a great many cases applying one or the other of them are discussed in a note in 57 A. L. R. 1142.

They may produce very different results in the same case, and would do so in the instant case, if the jury arrived at some permissible conclusions as to the value of the assets of the corporation at the time of the sale. It does

not seem to be entirely clear from the previous opinions of this court which of them is the law of this State and the question is not before us for decision in the instant case, because of the rather peculiar state of affairs. Counsel for the defendant excepted to the former part of the charge, but did not except on the ground of inconsistency between the two parts, and neither of the counsel in the case excepted to the latter part of the charge. Yet both of them have contended in their briefs and oral arguments before us that the former part of the charge stated the law correctly, and neither of them has tried to take any advantage of the rule laid down in the latter part of the charge. We very much doubt whether either of them or the trial justice or the jury realized that the latter of the two rules given in the charge was substantially different from the former one, and we cannot tell which one of them the jury tried to follow.

It is true that the defendant's counsel did request the trial justice to charge the jury that, if the value of the shares of stock, at the time of their sale, was as much as or more than the plaintiffs paid for them, the verdict should be for the defendant, and to charge them that if they found that the value of the shares was then less than the plaintiffs paid for them, the jury should award them the difference as damages. It is also true that the defendant's counsel excepted to the rulings of the trial justice in denying these requests, and that they were both based on the former of the two rules as to the measure of damages. But they both ignored the right of the plaintiffs to recover for such money as they may have furnished to the corporation in reliance upon the defendant's false representation and lost by reason of such reliance. Therefore, as above stated, the question which of the above rules is the correct one is not before us for decision.

What is of importance in this case, as now presented to us for decision, is the fact, recognized by both of these parts of the charge and in both of the specific rules above

discussed, that the value of the stock purchased by the plaintiffs, at the time of the purchase, was a vital element in the calculation of the damages directly suffered by the plaintiffs from the defendant's deceit. Counsel agree that if the stock had then been worth as much as $7,000 there would have been no damage to the plaintiffs as the direct result of their purchase of the stock for that price.

Counsel for the plaintiffs, however, contend that there was no evidence on which the jury could reasonably have found that the stock was then worth as much as $7,000. In this contention we cannot agree with them. There was testimony from the plaintiffs' own expert witness, who had been acquainted with the theatre and its management for years and knew much about the equipment and its purchase cost and condition, and there was also testimony from the defendant as to the cost and value of the equipment.

The jury were not bound to follow the opinion of this witness for the plaintiffs as to the value of the corporate stock; and from the above-mentioned testimony as to the facts about the equipment, they could reasonably have found that the value of the equipment on August 14, 1933, was as much as $10,000. Both of these witnesses spoke of the lease, with about eight and a half years still to run, as if it was the main asset of the corporation. It is true that it was then subject to termination for nonpayment of rent for some months, but it had not been terminated and in fact was not terminated until the corporation surrendered it in December, 1933. It appears to us that the jury might reasonably have estimated from the evidence that the value of the leasehold interest was $5,000 or more, and that the value of all the assets of the corporation at the time of the sale of the stock was over $15,000.

As to the debts of the corporation, the evidence is not very clear, but the plaintiffs' counsel, in his questions to their expert witness, repeatedly referred to these debts, including the note secured by the mortgage on the equip-

ment, as being $7,000, and from this and the evidence in the case we believe, and the jury certainly might reasonably have found, that $7,000 was the approximate amount of these debts. Therefore, they might reasonably have found that the value of the stock of the corporation at the time of its sale was more than $7,000. If they did so, there would be no direct damages from the purchase of the stock under the former rule, while under the latter rule such damages would be the amount of the concealed debts of the corporation, since the stock would have been worth that amount more, if these debts had not existed. On the other hand, if the assets of the corporation were found to be then worth only $4,000 and therefore the stock was of no value, the plaintiffs could only recover $3,000, if the concealed debts were $7,000, because, if those debts had not existed, the stock would only have been worth $3,000.

From these considerations it seems clear to us that the question, whether or not the value of the stock at the time of its sale was less than $7,000, was a material issue in the case, which the defendant was entitled to have submitted to the jury on his request. Two of the exceptions now before us are to the refusals of the trial justice to submit to the jury these questions for special findings: "Was the value of the stock on August 14, 1933, more than the plaintiffs paid for it?" and "Was the value of the stock on August 14, 1933, less than the plaintiffs paid for it?" General Laws, 1923, Chap. 341, Sec. 6, provides as follows: "In any case the court may, and upon request of either party shall, direct the jury to return a special verdict upon any issue submitted to the jury. Such issues shall be settled by the justice presiding at the trial, and either party may except to his rulings thereon."

This does not make it the duty of the trial justice to require the jury to return a special finding on an issue that is not material in the case on trial. *Maynard's Motor Equipment Co.* v. *Scotti,* 50 R. I. 134; *Reid* v. *Rhode Island Co.,* 28 R. I. 321. But under this statute it is error on

his part to refuse a request by a party to submit to the jury, for a special finding, any issue which really is material and which would assist the requesting party, upon a review of the testimony before the trial justice or this court, in presenting properly the question whether or not the verdict or finding was supported by the evidence. *Heathcote* v. *Barbour*, 39 R. I. 485, 488; *Doyle* v. *Ralph*, 49 R. I. 155, 158. In our judgment, as above stated, the question whether or not the value of the stock on August 14, 1933, was less than $7,000 was a vital issue, at least on the question whether the plaintiffs suffered any direct loss from their purchase, under the former of the two rules of damages which the trial justice gave to the jury, and which they may have tried to follow; and the answer to that question would probably have greatly assisted the defendant in presenting properly before the trial justice and this court the questions whether or not the verdict was supported by the evidence and what rule of damages the jury followed. Therefore, in our judgment, his refusal to direct the jury to return a special finding on either of the issues which the defendant requested him to submit was an error which may well have been prejudicial to the defendant.

This error of law, especially when taken in connection with the error which we found *supra* was committed by the trial justice, in refusing to grant the defendant's motion for a new trial on the ground that the damages were excessive, prevents us from sustaining the verdict for any amount. On the other hand, the defendant clearly was not entitled, on the evidence, to have one directed for the plaintiff for ten cents damages. Therefore a new trial of the case must be ordered, and it seems to us neither necessary nor advisable for us to consider the questions raised by the other exceptions included in the defendant's bill of exceptions, but not already discussed herein.

The defendant's exceptions to the refusal of the trial justice to set aside the verdict on the ground of excessive damages and to his refusal to require the jury to return a

special finding on either of the questions which the defendant asked to have submitted to them, for special findings, are sustained, and the case is remitted to the Superior Court for a new trial.

*Eugene L. Jalbert,* for plaintiff.

*Henry M. Boss,* for defendant.